# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>AUDLEY MURPHY CRABLE (01),<br><br>    Defendant. | Case No. 16-40101-01-DDC |

## MEMORANDUM AND ORDER

Defendant Audley Crable asserts that the government delayed the Indictment violating his Due Process rights under the Fifth Amendment. As a result of this alleged unconstitutional pre-indictment delay, Mr. Crable moves the court to dismiss all counts of the Indictment. Doc. 23.

The court heard evidence and argument on this matter on September 29, 2017. During that hearing, Mr. Crable requested that the court defer its ruling on the pre-indictment delay issue until the close of evidence, or, at least, allow Mr. Crable to renew his motion at that time. The court expressed its desire to decide the issue pre-trial because Mr. Crable had filed a pretrial motion. But, the court explained that its pretrial ruling would not keep Mr. Crable from renewing his motion later. The court allowed Mr. Crable seven days to supplement his Motion to Dismiss with authority supporting a renewed motion at the close of evidence. The government was given seven days to respond to the supplement. Both parties have filed those additional briefs (Docs. 29 & 30).

The court is now ready to rule on the pre-indictment delay issue. For the reasons discussed below, the court denies Mr. Crable's Motion to Dismiss (Doc. 23), but concludes that Mr. Crable may renew his motion during trial or at the close of evidence if he so chooses.

I.  **Factual Background and Procedural History**

On November 14, 2011, Mr. Crable received a nine-month suspended sentence in lieu of twelve months' probation for unrelated charges in the Shawnee County District Court in Topeka, Kansas.

Five days later, on November 19, 2011, Mo's Express Convenience Store located at 810 Southeast 15th Street, Topeka, Kansas, was robbed by an armed suspect. The suspect fired several rounds at two clerks during the robbery and while both clerks sustained injuries, each of them survived. Mr. Crable allegedly committed these acts and he now stands accused of them in the current Indictment.

On December 29, 2011, the Topeka Police Department ("TPD") learned of Mr. Crable's possible involvement in the Mo's Express robbery from a Ms. Joiner, an inmate at Riley County Jail arrested on unrelated charges. She claimed Mr. Crable told her details about his involvement in the crime.

On January 11, 2012, TPD received additional information about Mr. Crable's possible involvement in the Mo's Express robbery from another inmate at Riley County Jail. This inmate was arrested on unrelated charges. He claimed Mr. Crable had talked about his involvement while this inmate was attempting to buy marijuana from a residence Mr. Crable allegedly had entered.

On January 15, 2012, Mo's Express Convenience Store was sold to Phillips 66 after its co-owner was imprisoned for narcotics offenses.

On March 20, 2012, TPD detained Mr. Crable on three unrelated charges, holding him in the Shawnee County Jail. Mr. Crable has remained incarcerated at multiple correctional facilities from this date to present.

On June 8, 2012, TPD interviewed Mr. Crable about his suspected involvement in the Mo's Express robbery.

On January 11, 2013, a third inmate arranged to make a sworn statement in exchange for immunity and release on bond on his current cases. The statement implicated Mr. Crable in the robbery.

On June 26, 2013, TPD applied for an arrest warrant for Mr. Crable for Attempted Murder and Aggravated Robbery. But, no warrant was ever issued and Mr. Crable was not arrested as a result of this application.

Between June 2013 and August 2015, TPD did not record any activity in the robbery case file. On August 18, 2015, the FBI began investigating the Mo's Express robbery for the first time. FBI agents began by interviewing Mr. Crable on September 9, 2015.

On January 21, 2016, the FBI interviewed Derrick Crawford, a federal inmate who is the former boyfriend of Ms. Joiner—the Riley County inmate who first had implicated Mr. Crable in the robbery back in 2012. Mr. Crawford claimed he had heard that either Mr. Crable or another individual was involved in the Mo's Express robbery from the individual that made the sworn statement on January 11, 2013. The FBI learned about Mr. Crawford's professed knowledge during their re-interview of Ms. Joiner in early January 2016. She had not mentioned Mr. Crawford's name during her December 29, 2011 interview with TPD.

During January and February 2016, the FBI interviewed seven individuals about the Mo's Express robbery. These interviews included both re-interviews, like Ms. Joiner's, and new interviews, like Mr. Crawford's.

On June 14, 2016, the FBI requested enhancement of video surveillance of the Mo's Express robbery from the FBI Image Analysis Unit at Quantico, Virginia. The agent requesting the enhancement asked for his request to "be treated as a priority as the case is close to reaching its statute of limitations." But, the request was delayed by a higher priority case—the Orlando night club shooting resulting in 49 deaths in June 2016. Around the same time, an FBI Agent and Task Force Officer were wounded while conducting a surveillance operation. Both were assigned to the Mo's Express robbery case and the FBI agent was one of the lead investigators. This also delayed the investigation.

During August and September 2016, the FBI conducted two more interviews. On September 20, 2016, the FBI Image Analysis Unit at Quantico issued a report announcing it had failed to match video surveillance images of the Mo's Express robbery suspect to images of Mr. Crable.

On October 14, 2016, the FBI interviewed Mr. Crable again and advised him that it planned to present the case to a federal grand jury within a month. On November 16, 2016, two days before the statute of limitations expired on the Mo's Express robbery, the government charged Mr. Crable with one count of interference with commerce by means of robbery, commonly known as a Hobbs Act robbery charge, in violation of 18 U.S.C. §§ 1951 and 2; and, one count of using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (C)(i).

## II.     Analysis

The statute of limitations provides "the primary guarantee against bringing overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)) (internal quotations omitted). But, "the 'statute of limitations does not fully define defendants' rights with respect to the events occurring prior to indictment,'" and "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Id.* (quoting *Marion*, 404 U.S. at 322). Although it provides some protection,

> the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining due process, to impose on law enforcement officials our personal and private notions of fairness and to disregard the limits that bind judges in their judicial function.

*Id.* at 790 (internal quotations and citations omitted). Courts must determine only whether the pre-indictment delay violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Id.* (internal quotations and citations omitted). Thus, "proof of prejudice is generally a necessary but not sufficient element of a due process claim." *Id.* "The due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.*

The cases from our Circuit recognize that prosecutors enjoy broad discretion when deciding when to bring charges. *United States v. Mitchell*, 558 F. App'x 831, 833–34 (10th Cir. 2014). But, this discretion is not limitless. When a defendant asserts that a prosecutor has delayed improperly and thus violated the Due Process Clause, the Tenth Circuit uses a two-pronged test to evaluate the claim. The Due Process Clause requires dismissal of charges when "(1) the government has caused the delay to obtain a tactical advantage or to harass the defendant, and (2) the delay has, in fact, unfairly prejudiced the defendant's case." *Id.* at 833 (quoting *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978)).

The burden of proof for demonstrating unconstitutional pre-indictment delay falls first on defendant. Defendant must show "that the delay in charging him has actually prejudiced his ability to defend, and that this delay was intentionally or purposefully designed and pursued by the Government to gain some tactical advantage over or to harass him." *United States v. Comosona*, 614 F.2d 695, 696–97 (10th Cir. 1980). If defendant carries this burden, the government then must show "that the delay was not improperly motivated or unjustified." *Id.* at 697. Finally, the defendant has "the ultimate burden of establishing the Government's due process violation by a preponderance of the evidence." *Id.*; *see also United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992).

The next two sections apply both prongs of this test to Mr. Crable's arguments in this case.

### A. Prejudice

"Defendant must show actual and not speculative prejudice to his defense occasioned by the passage of time." *United States v. Pino*, 708 F.2d 523, 528 (10th Cir. 1983); *see also United States v. McManaman,* 606 F.2d 919, 923 (10th Cir. 1979); *Revada,* 574 F.2d at 1049. "Generally, such prejudice will take the form of either a loss of witnesses and/or physical evidence or the impairment of their effective use at trial." *Comosona*, 614 F.2d at 696.

Mr. Crable argues that two circumstances caused him prejudice—his incarceration and the length of the delay. He asserts that he was incarcerated for four years and eight months of the nearly five-year delay before he was charged and that his incarceration limited his access to counsel. Mr. Crable also asserts that the length of the delay, potentially, has allowed eyewitnesses' memories to fade, affected the original crime scene, and limited his ability to present an accurate alibi. But, he provides no evidence to substantiate any of those assertions.

The passage of time alone does not amount to actual and substantial prejudice. *See United States v. Jakisa*, No. 14-cr-119 (SRN/SER), 2015 WL 1810259, at *3 (D. Minn. Apr. 21, 2015) ("contrary to Defendant's assertion, the passage of time alone—however significant—is not sufficient to raise a presumption of prejudice in the context of a Fifth Amendment due process claim."); *United States v. Bartlett*, 794 F.2d 1285, 1290 (8th Cir. 1986) ("prejudice which consists only of the mere passage of time while incarcerated and the loss of or impairment of memories does not constitute actual prejudice for purposes of the due process clause."); *United States v. Dacri*, 827 F. Supp. 550, 553 (E.D. Wisc. 1993) ("The passage of time admittedly dulls one's memory, but by itself it does not translate into prejudice to an accused."); *United States v. DeClue*, 899 F.2d 1465, 1471 (6th Cir. 1990) ("we find that the effect of the passage of time on defendant's ability to present a defense does not amount to substantial prejudice"); *United States v. Coppola*, 788 F.2d 303, 308 (5th Cir. 1986) ("Mere passage of time does not constitute actual prejudice"). So, the court must determine if the passage of time coupled with Mr. Crable's incarceration caused him actual and substantial prejudice. The court concludes that it did not.

Incarceration may have constrained Mr. Crable's ability to contact an attorney, but he never shows that this restraint was so substantial that he was unable to contact counsel during the five years between the crime and his Indictment. To be sure, Mr. Crable knew that he was a suspect in the Mo's Express robbery on June 8, 2012, when Topeka police officers interviewed him about it. This interview occurred more than four years before the government secured the Indictment and less than seven months after the robbery. Had Mr. Crable elected to take action at that time, he could have retained an attorney to investigate the crime scene and solidify an alibi. But, nothing suggests that Mr. Crable took these steps. Instead, he simply asserts

7

prejudice as a conclusion. But, he has not demonstrated that any witnesses' memories have faded, or any other prejudicial events such as "a loss of witnesses and/or physical evidence or the impairment of their effective use at trial." Mr. Crable's current showing falls well short of demonstrating a delay causing actual and substantial prejudice. He also has failed to show the government intentionally delayed the indictment to gain a tactical advantage.

### B. Intentional Delay

Next, Mr. Crable argues that "neither the Tenth Circuit nor the Supreme Court has squarely addressed whether a state of mind short of intent, such as negligence, could fall within the rubric of governmental misconduct." Doc. 23 at 7. Based on this assertion, Mr. Crable provides his analysis of Fourth, Seventh, and Ninth Circuit cases evaluating the government's culpability under a lower standard. Mr. Crable's assertion is misguided. In *Comosona*, the Tenth Circuit held that a defendant must show "intentionally or purposefully designed" delay. 614 F.2d at 696–97. Under the governing standard in our Circuit, a court can dismiss charges only for intentional or purposeful pre-indictment delay.

Mr. Crable must show that the pre-indictment delay "was intentionally or purposefully designed and pursued by the Government to gain some tactical advantage over or to harass him." *Id.* Mr. Crable argues that the delay was not investigative because the case was dormant for two years and no investigation occurred during that two years. His argument then leaps to the conclusion that because the delay was not investigative, it must have been designed to secure a tactical advantage. He asserts that the government used the delay to orchestrate a situation where he now faces a 25-year minimum sentence if convicted. Doc. 23 at 17. Mr. Crable has provided no support for his assertions.

8

Mr. Crable likewise fails to show that the government pursued a tactical advantage. The evidence presented at the September 29, 2017 hearing does suggest that the Mo's Express robbery case went cold[1] for about two years. The logical inference from the facts established in the record is that TPD exhausted all leads and concluded it could not meet the probable cause threshold for an arrest warrant. The case then sat dormant for two years until the FBI began investigating on August 18, 2015. From that point, it took 16 months for the government to seek an indictment. The investigative team encountered some delays that it could not avoid— members of the investigative team being wounded in the line of duty and higher priority cases taking precedent. But, the current evidence shows that the FBI continued to pursue the case as leads and opportunity arose.

During cross examination of the government's sole witness at the evidentiary hearing, defense counsel focused on the length of time it took to request enhancement of the surveillance video and the FBI re-interviewing witnesses that TPD previously had interviewed. It appeared that Mr. Crable was implying that the government used these as devices to delay the indictment. But, TPD already had submitted the video for enhancement so the FBI needed to decide whether to send it to TPD's enhancement unit or the FBI enhancement unit. To the second issue, Special Agent Knooihuizen testified at the September 29, 2017 hearing that during re-interviews, the FBI learned new information that led them to new witnesses. They then interviewed the new witnesses and re-interviewed others about the new information. Ultimately, the FBI's investigative process led them to new witnesses and evidence that resulted in Mr. Crable's indictment.

---

[1] Special Agent Knooihuizen explained a cold case. It's a "[c]ase that just all the leads have been exhausted. There's really nowhere to turn and it's gone stale." Tr. of Motion Hr'g at 21.

The government is entitled to build its case. In *Lovasco*, the Supreme Court recognized the latitude afforded to prosecutors and the undesirable effects of requiring prosecutors to seek indictments at a set time:

> It requires no extended argument to establish that prosecutors do not deviate from fundamental conceptions of justice when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *Marion*, a formal accusation may interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.
>
> It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete. Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause.

431 U.S. at 790–92 (internal quotations and citations omitted). The government is free to seek indictments when it sees fit so long as it does not "intentionally or purposefully" design delay to gain some tactical advantage or harass the defendant. *Conosoma*, 614 F.2d at 696–97. Here, Mr. Crable has failed to establish that the government strayed outside those limits.

The evidence establishes the FBI received a cold case from TPD almost four years after the crime occurred, and two years after the case had gone cold. The FBI had the TPD reports from interviews already conducted, but the FBI had to re-interview the witnesses to confirm that testimony was the same and pursue new leads—a challenging and undesirable endeavor after so long. They also had a poor quality surveillance video that provided little assistance in identifying the suspect. The FBI endeavored to reach the probable cause threshold when TPD previously could not. And, for the United States Attorney's Office to pursue the case, the FBI needed to gather evidence to prove defendant's guilt beyond a reasonable doubt. The record reflects that goal. And, the record fails to establish that the government made any decisions to intentionally or purposefully delay the indictment, much less to gain a tactical advantage.

The court thus rules that Mr. Crable has not established that pre-indictment delay violated his Due Process rights. Accordingly, the court denies Mr. Crable's pretrial Motion to Dismiss (Doc. 23).

### III. Renewed Motion to Dismiss

Although the court denies Mr. Crable's pretrial Motion to Dismiss, this ruling does not foreclose his ability to raise pre-indictment delay again. Federal Rule of Criminal Procedure 12(b)(3) requires the defendant to raise the issue of pre-indictment delay before trial. But, the court can defer its ruling. Fed. R. Crim. P. 12(d) ("The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling"). Also, a defendant can renew his motion for dismissal for pre-indictment delay during trial, or at the close of evidence.

In *United States v. Wilson*, 420 U.S. 332 (1975), the defendant filed a pretrial motion to dismiss the indictment on the ground of pre-indictment delay. *Id.* at 354 (Douglas, J. dissenting). The district court held two pretrial hearings, and then denied the motion. *Id.* At the close of

11

evidence, defendant renewed his motion to dismiss because of pre-indictment delay.  *Id.*  The court withheld its decision until it received the verdict.  *Id.*  Once the jury found the defendant guilty, the court ruled in defendant's favor, finding that the government unreasonably had delayed the indictment based evidence presented during trial.  *Id.* at 354–55.  Other cases follow a similar path.

For example, in *United States v. Scott*, 437 U.S. 82 (1978), the defendant moved once before trial and twice during trial to dismiss the two counts of the Indictment on the ground that he was prejudiced by pre-indictment delay.  *Id.* at 84.  At the close of all the evidence, the court granted defendant's motion.  *Id.*  In *United States v. Pino*, 708 F.2d 523 (10th Cir. 1983), the defendant moved both before and after trial for dismissal of the indictment on the ground of pre-indictment delay.  *Id.* at 526.  On both occasions the court held evidentiary hearings and denied defendant's motions.  *Id.*  Defendant rightfully renewed the issue again on appeal.  *Id.* at 527.

These cases certainly suggest that a defendant may renew a motion to dismiss the Indictment for pre-indictment delay during trial, at the close of evidence, and, even on appeal.  The court plans to take the same approach to Mr. Crable's arguments here.  In sum, this Memorandum and Order concludes that he has failed to meet his burden on a pretrial motion.  But, he is free to renew the issue as he sees fit, both during the trial, after the evidence, and, if appropriate, after the verdict.

## IV.   Conclusion

For reasons discussed above, the court denies Mr. Crable's Motion to Dismiss (Doc. 23).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Audley Murphy Crable's Motion to Dismiss (Doc. 23) is denied.

**IT IS SO ORDERED.**

**Dated this 26th day of October, 2017, at Topeka, Kansas.**

<pre>                                        s/ Daniel D. Crabtree    
                                        Daniel D. Crabtree
                                        United States District Judge</pre>