## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

AUDLEY MURPHY CRABLE (01),

      Defendant.

Case No. 16-40101-01-DDC

## MEMORANDUM AND ORDER

Defendant Audley Murphy Crable asserts that the government destroyed exculpatory evidence violating his due process rights under the Fourteenth Amendment. Specifically, he claims that the government failed to preserve 75 minutes of video footage originally recorded by the owner of the store where the robbery charged in this case occurred. Because of this alleged violation, Mr. Crable asks the court to dismiss the Indictment. Doc. 44.

The court has held two evidentiary hearings on this destruction of evidence issue—one on February 23, 2018, and a second one on March 19, 2018. Then, Mr. Crable filed his Motion to Dismiss (Doc. 44) and the government filed its Response (Doc. 47). On May 21, 2018, the court heard oral argument on the motion and then, the parties submitted it to the court for decision.

The court now is ready to rule on this destruction of evidence issue. For the reasons discussed below, the court denies Mr. Crable's Motion to Dismiss (Doc. 44).

## I.    Background

The following facts are taken from the evidence presented at the February 23 and March 19, 2018 hearings.

A.      Robbery

On November 19, 2011 at 6:17 a.m. Central Standard Time, Mo's Express Convenience Store ("Mo's"), located at 810 SE 15th Street, Topeka, Kansas, was robbed at gunpoint by a single suspect.  The suspect fired several rounds at two store clerks, Evette Vice and Kenneth Ray, during the robbery.  Both victims were wounded but they survived.

Officers from the Topeka Police Department ("TPD") responded to the scene and Detective George Henley took charge of the investigation.  Corey Brown, co-owner of Mo's along with Monroe Lockhart,[1] gave TPD consent to search the store.  Mr. Brown and Mr. Lockhart also owned Hudson Liquor and Hudson Laundromat together.  All three businesses occupied a strip mall known as Hudson Crossing.  Mr. Brown and Mr. Lockhart maintained a video surveillance system that monitored the interior and exterior of all three businesses.  The system contained 24 cameras[2] that digitally recorded footage onto two hard drives ("DVRs") that the owners stored in the rear office of Mo's.

Police viewed footage of the robbery while at the scene.  DVR #1 captured video from 16 cameras—14 displaying Mo's interior and two displaying its exterior.  DVR #2 captured video from eight other cameras that captured the interior and exterior of both the liquor store and the laundromat.  For unexplained reasons, the time stamp displayed on DVR #1's footage was one hour ahead of Central Standard Time.  So, all the footage captured on DVR #1 displayed the time of the robbery as 7:17 a.m.

---

[1]     The parties also have referred to this co-owner as Monroe Aldridge.  The court will refer to him as Mr. Lockhart.

[2]     The cameras were motion activated so they only recorded footage when they detected movement.

Some of the footage showed the suspect at the premises before, during, and after the robbery. The suspect wore a mask and the image quality was poor. But officers wanted to distribute images as part of an effort to seek public assistance with identifying the suspect. So TPD sent the surveillance video to Corporal Thad Winkelman of the Shawnee County Sheriff's Office. Cpl. Winkelman was, and still is, assigned to the Heart of America Regional Computer Forensics Laboratory ("RCFL") in Kansas City, Missouri. As an expert in video forensics, Cpl. Winkelman was tasked to extract video clips and images from the footage.

On the morning of November 21, 2011, two days after the robbery, Det. Karim Hazim, at Det. Henley's request, took custody of both DVRs and delivered them to RCFL. When he arrived at Mo's, Det. Hazim met Mr. Lockhart and explained the need to take the two DVRs to RCFL for analysis. Mr. Lockhart contacted his security company, who arrived 20 minutes later to disconnect both DVRs. RCFL took custody of the DVRs at 11:56 a.m. that day.

### B.    Extraction of Video Footage

Initially, TPD only requested video footage of the robbery itself. Cpl. Winkelman extracted two clips—one from each DVR. The clip from DVR #1 was about two minutes long and showed the robbery inside Mo's. Cpl. Winkelman noted the one-hour time difference in his notes and initial report. *See* Def. Ex. 101 and Pl. Ex. 1. The clip from DVR #2 was about four minutes long and showed the suspect approaching and leaving Mo's. On November 22, 2011, Cpl. Winkelman gave TPD these clips and some still images he had created from them.

TPD then made a second request. It asked Cpl. Winkelman to capture footage from both DVRs covering the 48 hours leading up to the robbery. Cpl. Winkelman began fulfilling this request at the RFCL. But Mr. Lockhart wanted the DVRs returned to the store so he could use his surveillance system. Cpl. Winkelman returned the DVRs and set them up in a locked cage at

Mo's where he could continue to extract footage to satisfy the second request. Cpl. Winkelman set the extraction devices to capture footage from both DVRs for the 12 hours before the robbery. He testified that once that footage was extracted, he planned to extract footage during another 12-hour block—*i.e.*, from 24 to 12 hours before the robbery. He planned to continue using this methodology until he had captured footage from the 48 hours leading up to the robbery, as TPD had requested.[3]

Although the on-site extraction allowed the surveillance system to monitor the premises, the extraction process would not allow Mr. Lockhart to view the surveillance footage remotely. According to Cpl. Winkelman's testimony, Mr. Lockhart wanted to be able to view the footage from his home computer as he had before the robbery. But the extraction process prevented remote viewing. So, Mr. Lockhart withdrew the consent he had given to permit extraction. And Cpl. Winkelman discontinued extraction. Some extraction already had occurred, but by the time Mr. Lockhart withdrew his consent, the footage from DVR #1 ended 75 minutes before the robbery. This means that there is no footage from the 16 interior cameras at Mo's for the 75 minutes before the robbery.[4] This 75 minutes of missing footage is the evidence at issue here. The parties agree that no one knew this footage was missing until defense counsel notified the prosecutor in this case nearly six years later.

---

[3] Corporal Winkelman's hearing testimony suggests that he may not have accounted for the one-hour time difference on DVR #1 or, perhaps, mistakenly allowed for it on the wrong DVR. *See* Doc. 43 (Mar. 19, 2018 Hr'g Tr.) at 31. Regardless, 60 minutes of the 75-minute gap is missing as a result of Cpl. Winkelman's error regarding the time difference.

[4] The video footage from DVR #2 (the eight exterior cameras) is available from 12 hours before the robbery all the way through and after the robbery. But Mr. Crable contends that the lighting and motion-activated nature of the cameras makes it impossible to identify individuals—including himself—entering and exiting Mo's in the 75 minutes before the robbery.

After Mr. Lockhart withdrew his consent, TPD took no further action.  For example, it never sought a search warrant or other compulsory process to secure the missing footage—or any other footage.  Cpl. Winkelman placed the extracted footage from both DVRs on a portable USB drive.[5]  Cpl. Winkelman testified that he left a voicemail for Det. Henley about Mr. Lockhart's decision to withdraw his consent.  Det. Henley does not recall this voicemail.  Almost four months later, on March 8, 2012, the RCFL sent the USB drive to the TPD.

On June 26, 2013, TPD stopped actively investigating the Mo's robbery.  It never had arrested anyone in connection with it.  More than two years later, on August 18, 2015, Task Force Officer ("TFO") Patrick Salmon with the FBI resumed the investigation.  He viewed two clips of the robbery.  They were the two and four-minute clips that Cpl. Winkelman extracted first back in 2011.

More than another year later, on October 24, 2016, TFO Salmon discovered additional video footage maintained in TPD's property room.  This footage was the larger blocks that Cpl. Winkelman had extracted as part of TPD's second request back in 2011.  After viewing the footage, TFO Salmon noted that Mr. Crable was captured on video inside Mo's twice before the robbery—once at 11:30 p.m. and once at 3:49 a.m.  During these instances, Mr. Crable wore a white t-shirt, dark blue jeans, black and white sneakers, and a green and white knit cap.

The government provided defense counsel copies of all the extracted footage during discovery.  After reviewing the footage, defense counsel found the 75-minute gap between the clip showing Mo's interior before the robbery and the clip showing the robbery itself.  On October 15, 2017, defense counsel notified the prosecutor who began investigating the issue.  This investigation led to the court's February 23, 2018 and March 19, 2018 hearings.  In sum,

---

[5]   Cpl. Winkelman testified that he did not review the footage before or after placing it on the USB drive.  *Id.* at 47.

those hearings established that Cpl. Winkelman never extracted the 75 minutes of missing video from DVR #1.

## II.    Analysis

Mr. Crable now contends that the government's failure to extract the video footage before it was destroyed violated his due process rights.

### A.    Legal Authority

Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded "a meaningful opportunity to present a complete defense"—*i.e.*, access to "exculpatory" and "material" evidence. *California v. Trombetta*, 467 U.S. 479, 485 (1984) (first citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963); then citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)). A defendant can ask the court to dismiss an indictment if the government destroys such evidence. *See, e.g.*, *United States v. Hood*, 615 F.3d 1293, 1294 (10th Cir. 2010).

The government's destruction of evidence violates due process if the evidence: (1) "possess[es] exculpatory value that was apparent before the evidence was destroyed;" and (2) "[is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. If the evidence at issue was merely "potentially useful," rather than exculpatory, the defendant must show the government acted in "bad faith" when it destroyed the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

### B.    Nature of the Evidence: Exculpatory or Potentially Useful?

The case authority provides the court with two avenues of analysis—one used when the evidence lost was exculpatory and another used when the evidence was potentially useful. So, the court first must determine if the 75 minutes of missing video possessed "exculpatory value that was apparent before" the video was destroyed. *See Trombetta*, 467 U.S. at 489.

6

Mr. Crable argues that the government knew this video could be exculpatory because Det. Henley requested the footage to determine "if there was any suspicious activity." Doc. 42 (Feb. 23, 2018 Hr'g Tr.) at 83. Det. Henley acknowledged that the missing video might be "damning" or "exonerating." *Id.* But Mr. Crable has adduced no evidence that Det. Henley or any other government actor ever viewed the 75 minutes of missing video. And *Trombetta* plainly requires the exculpatory value of the destroyed evidence to be "apparent before" it was destroyed. 467 U.S. at 489. If no government actor saw the missing video, the exculpatory value of the missing video could not have been apparent to the government before it was destroyed.[6] So, Mr. Crable has failed to establish a due process violation under the *Trombetta* theory.

"[I]f the exculpatory value of the evidence is indeterminate"—that is, an unknown—then defendant must show the evidence was "potentially useful" and that "the government acted in bad faith in destroying or failing to preserve the evidence." *United States v. Bohl*, 25 F.3d 904, 911 (10th Cir. 1994) (citing *Youngblood*, 488 U.S. at 58). Mr. Crable contends that the missing video is potentially useful because it would show him visiting Mo's a third time—as a customer dressed in street clothes—who made a purchase within the missing 75 minutes just before the robbery. He argues this is potentially useful because it would show how unlikely it is that he had time to change from the street clothes he wore that night—as shown, he claims, on the missing video—into the clothes the suspect wore during the robbery. If the missing video captured what

---

[6]    Based on this conclusion, the court need not determine if the missing video is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *See Trombetta*, 467 U.S. at 489.

Mr. Crable claims it captured, that video could be potentially useful to Mr. Crable.[7]  But he has done nothing to establish that, in fact, he visited Mo's a third time the night before the robbery; or, even if he did, when he did so.  His attorney simply asserts it is true.  And so, the current record cannot abide a finding that the missing video was potentially useful.[8]

For these reasons, Mr. Crable has failed to establish the missing video was exculpatory, or even potentially useful to him.  And even if the court could determine the missing video was potentially useful, Mr. Crable, as explained in Part C, has failed to show the government acted in bad faith.

### C.    Did the Government Act in Bad Faith?

The bad faith inquiry turns on the government's "'knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'"  *Bohl*, 25 F.3d at 911 (quoting *Youngblood*, 488 U.S. at 57 n.*).  The court weighs this important component using the following six factors:

> (1) the government was on notice that the defendant believed the evidence to be potentially exculpatory; (2) the defendant's assertion (to the government) of its potential exculpatory value was merely conclusory or supported by objective, independent evidence; (3) the government still had possession of or the ability to control the disposition of the evidence at the time it received notice from the defendant of the evidence's potential exculpatory value; (4) the destroyed evidence was central to the government's case, (5) the government offers an innocent explanation for its failure to preserve the evidence; and (6) the destruction of the evidence was in accordance with standard procedure and the evidence was adequately documented prior to its destruction.

---

[7]    The usefulness of this video would depend on when Mr. Crable visited Mo's within the 75-minute period.  This is especially true because Mr. Crable asserts that he lived within walking distance of Mo's.  So the closer in time to the robbery he visited, the more useful the video would be to him.

[8]    Mr. Crable makes other arguments about the potential usefulness of the missing video.  But these arguments are founded on the assertion that Mr. Crable visited Mo's a third time during the 75 minutes of missing video.  The court found none of these arguments convincing because Mr. Crable has failed to present any evidence that he visited Mo's during that time.

*United States v. Gutierrez*, 415 F. App'x 870, 875 (10th Cir. 2011) (citing *Bohl*, 25 F.3d at 911–13).

Here, all six factors favor the government. The first three factors do not apply here because the issue of the missing video did not arise until the native source of the video already had been destroyed. The fourth factor weighs in the government's favor. Presumably, the government didn't plan to use the missing video in its prosecution because it didn't even realize it was missing. The fifth factor also favors the government because the government has provided an innocent and credible explanation for its failure to preserve the evidence. It lost access to the footage when Mr. Lockhart withdrew consent. Finally, the sixth factor weighs in the government's favor because it had no control over the destruction of the evidence—Mr. Lockhart controlled the footage on the DVRs after he withdrew consent. In sum, the government attempted to extract the footage, not knowing if it contained exculpatory or inculpatory value. But it stopped extraction when Mr. Lockhart withdrew consent.

Mr. Crable tries to make much of the government's decision not to secure custody of Mr. Lockhart's DVRs by warrant or some other compulsory means. But his arguments miss the mark. No evidence even hints that the government ever knew that any video footage was missing. To the contrary, all the evidence suggests that no one knew about the missing video until Mr. Crable's current defense counsel discovered the gap. Indeed, the fairest inference is that when Mr. Lockhart withdrew his consent, TPD believed Cpl. Winkelman had captured footage of the robbery itself—twice—and footage showing the 12 hours before it occurred. A logical law enforcement officer reasonably could conclude that the 36 hours before that 12 hours was not worth the work a warrant required.

At bottom, Mr. Crable argues that the government's failure to extract those 75 minutes of footage, by itself, demonstrates bad faith, but that is not enough. *See United States v. Richard*, 969 F.2d 849, 853–54 (10th Cir. 1992) ("The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." (citation omitted)). Simply put, negligence, or even intentional conduct, is not enough to establish bad faith. *Riggs v. Williams*, 87 F. App'x 103, 106 (10th Cir. 2004) (citing *Bohl*, 25 F.3d at 910); *see also United States v. Gonzalez-Perez*, 573 F. App'x 771, 776 (10th Cir. 2014) (citing *Youngblood*, 488 U.S. at 58). Instead, bad faith requires: "(1) willful conduct motivated by a desire to obtain a tactical advantage over the defense or (2) a departure from the government's normal . . . procedures." *Gonzalez-Perez*, 573 F. App'x at 776.

Mr. Crable questions Cpl. Winkelman's credibility—saying no other witness corroborated Cpl. Winkelman's testimony that Mr. Lockhart withdrew consent. Mr. Crable contends that this credibility issue suggests bad faith—that Cpl. Winkelman had a bad faith motive not to extract footage of the last 75 minutes before the robbery. But this argument fails because Mr. Crable has adduced no evidence capable of supporting a finding that Cpl. Winkelman was "motivated by a desire to obtain a tactical advantage over the defense." *See id.* Mr. Crable could have called Mr. Lockhart to testify about whether he withdrew his consent in November 2011—but Mr. Crable didn't.[9]

At most, Mr. Crable has adduced evidence that the government was negligent in its preservation of this evidence. He notes that Cpl. Winkelman failed to account for the one-hour difference on DVR #1's time stamp. He also says that neither Cpl. Winkelman nor any other law

---

[9]    The parties advised that Mr. Lockhart is currently incarcerated for murdering the co-owner of Mo's Express. *See* Shawnee Cty., Kan. Dist. Ct. Case No. 14CR21. But that doesn't mean he's unavailable to testify.

enforcement officer reviewed the footage. If they had, he says, they would have diagnosed that 75 minutes was missing and had time to recover it before the original footage was lost.

The court agrees with some of Mr. Crable's criticisms. TPD and the RCFL easily could have done more. But nothing in the governing authorities requires law enforcement officials to conduct a perfect investigation. Their mistakes—even viewed as Mr. Crable views them—fall far short of bad faith. He has failed to show the government acted intentionally, much less, that it was motivated by a desire to obtain a tactical advantage or depart from the government's normal procedures.

III.    **Conclusion**

In sum, Mr. Crable has failed to show the exculpatory value of the missing video was apparent to the government before it was destroyed. To demonstrate a due process violation under the *Youngblood* theory, Mr. Crable had to show that the missing video was potentially useful to him and the government acted in bad faith. He failed to establish either one. The court thus denies Mr. Crable's Motion to Dismiss (Doc. 44).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Audley Murphy Crable's Motion to Dismiss (Doc. 44) is denied.

**IT IS SO ORDERED.**

**Dated this 15th day of June, 2018, at Topeka, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**